**Opinion issued April 2, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00953-CV

———————————

### THE STATE OF TEXAS, Appellant

### V.

### JASDEEP SINGH CHANA, MANJIT SINGH CHANA, AND AMAR PAL SINGH CHANA, Appellees

---

**On Appeal from County Civil Court at Law No. 2
Harris County, Texas
Trial Court Case No. 969941**

---

### O P I N I O N

This eminent-domain case involves a dispute over the fair market value of 2.072 acres of land, acquired by the State from the Chana family for the purpose of constructing a detention pond associated with the roadway expansion of FM 529. On appeal, the State challenges the trial court's judgment, which awarded the Chanas $922,256.00 as compensation for the condemnation of their property.

The State identifies four issues in which it complains that the trial court abused its discretion in making certain evidentiary rulings. In its first two issues, the State asserts that the trial court abused its discretion when it admitted the testimony of the Chana's real estate appraisal expert. The State's third issue challenges the admission of certain comparable land sales, and the State's fourth issue assails the trial court's exclusion of records from a tax-protest hearing in which the Chanas challenged the taxes assessed for the property.

We affirm.

## Background

Jasdeep Singh Chana, Manjit Singh Chana, and Amar Pal Singh Chana ("the Chanas") owned a 7.765-acre tract of vacant land in Harris County, Texas. The land sat at the intersection of FM 529 and Enchanted Creek Drive in Katy, Texas. The rectangular-shaped tract was bounded by FM 529 on its northern side and Enchanted Creek Drive on its western side. The tract's eastern side was bounded by Dinner Creek. Behind the tract's southern property line was a housing subdivision.

In 2010, the State sought to obtain 2.385 acres out of the 7.765-acre tract for the construction of a detention pond, needed as part of the roadway expansion of FM 529. The State planned to construct the detention pond on the eastern most

2

part of the Chanas' property next to Dinner Creek. The Chanas requested the State to decrease the size of the taking to permit the Chanas's remaining 5.693 acres of land to maintain access to Dinner creek for drainage and detention purposes. The State agreed and shifted the back boundary of the taking 30 feet forward to the north. This gave the Chanas a strip of land behind the State's taking, which connected the remainder of their property to Dinner Creek, allowing for future drainage and water detention. After this change, the amount of land condemned by the State for construction of the detention pond was reduced from 2.385 acres to the 2.072 acres.

The State petitioned the county court to condemn the 2.072 acres to use in conjunction with TxDOT's roadway expansion of FM 529. The county court appointed three special commissioners to determine the fair market value of the land. Following a hearing, the commissioners awarded the Chanas $722,176.00. The State objected to the award and requested a jury trial. On November 29, 2010, the State deposited the full amount of the commissioner's award into the court's registry, thereby establishing the date of the taking and the date that the State acquired the 2.072 acres of land.

The case proceeded to trial before a jury for a determination of the amount of money due the Chanas for the 2.072 acres of land condemned by the State for its

3

roadway-expansion project. Each side offered the testimony of its own real-estate appraisal expert to show the fair market value of the property as of November 29, 2010.

The State filed a pre-trial motion to exclude the testimony of the Chanas' real-estate appraisal expert, Mark Sikes. The trial court denied the motion and, over the State's continued objections at trial, permitted Sikes to testify. Sikes testified that the highest and best use for the Chanas' 7.765-acre piece of land was to divide it into three separate, independent land parcels or "economic units" for commercial development. He opined that the 2.072 acres taken by the State would be part of a 2.385-acre self-sufficient economic unit. Located on the eastern most side of the Chanas' property, this rectangular-shaped economic unit was fronted on its northern side by FM 529, a major thoroughfare. The economic unit had Dinner Creek on its eastern boundary, the Chanas' remaining property on its western boundary—which Sikes opined should be divided into two other self-sufficient economic units—and a housing subdivision behind its southern boundary. Although he testified that the Chanas' remaining property could be divided into two additional economic units, Sikes testified that he did not appraise those economic units because he had been retained to appraise only the property condemned by the State, which was part of the eastern economic unit.

4

Sikes acknowledged that the economic unit, containing the condemned property, mirrored the dimensions of the parcel of land that the State had originally planned to condemn before agreeing to permit the Chanas to retain a 30-foot strip at the back of the property for drainage purposes. Sikes testified that the 2.385-acre economic unit was independent of, and could be marketed and sold separately from, the remaining land owned by the Chanas.

According to Sikes, the highest and best use of the 2.385-acre economic unit would be commercial development. Sikes testified that, both before and after the condemnation in this case, the commercial real-estate market was active in the area where the Chanas' property is located. He stated that there had been commercial development of properties to the east and to the west of the land. Sikes pointed out that the Chanas' property was located less than a mile from the major intersection of Fry Road and FM 529. This intersection had been commercially developed with nationally recognized stores and a bank. Sikes testified that these businesses generated traffic and that the Chanas's property was in the "sphere of influence" of that intersection. Sikes also stated that, in the last decade, there had been a growth of housing subdivisions in that area, which provided a residential base for commercial property. According to Sikes, there had been "quite a bit" of residential development around the Chanas' property, and it sat at "one of the

primary commercial thoroughfares that provides access to that residential property."

In forming his opinion, Sikes relied on the sale of 10 properties, which he averred were comparable to the condemned property. He testified that he had based his conclusion that the condemned property could be sold as part of a separate 2.385-acre economic unit for commercial development on these property sales. He stated that these comparable properties were in the area surrounding the Chanas' property. Eight of the ten properties were less than one mile from the Chanas' property and two were slightly further away. The sales of these 10 properties occurred between June 2006 and November 2011. These properties ranged in size from .776 acres to 2.939 acres in size. The sales price of these properties ranged from $7.70 to $20.00 per square foot. Sikes stated that it is unusual for him as an appraiser to find so many property sales in such close proximity to the property that is the subject of appraisal. Sikes stated that this indicated that real estate, sold as smaller economic units for commercial develop, was in demand in the area of the Chanas' property.

A few of the properties relied on by Sikes to appraise the subject property had been subdivided from larger tracts of land and then sold as separate economic units for commercial development. With regard to the area where the Chana's

property was located, Sikes testified that "everybody's selling and developing smaller tracts out of larger tracts. I think that the highest and best use of the Chanas' [property] would be the exact same, what the market is doing." Sikes testified that he did not find property along FM 529 being sold as large seven acre tracts of land. Rather, he stated that landowners in the area were dividing their property and selling off smaller economic units.

On cross-examination, Sikes acknowledged that the 10 properties he utilized as comparable properties were either located on a corner or had access to two major thoroughfares. In comparison, the 2.385-acre economic unit defined by Sikes on the Chanas' property had frontage on one major thoroughfare, FM 529, and was located "mid-block" with the nearest intersection being FM 529 and Enchanted Forest, a street accessing a housing subdivision. Sikes also acknowledged that some of the comparable properties had more infrastructure and utilities in place than the economic unit he had defined.

Sikes explained, however, that appraising real estate is an art, not a science, entailing a subjective, qualitative analysis. He stated that an appraiser looks at the marketplace to find comparable properties. He indicated that, the more comparable properties an appraiser had to analyze, the better his analysis would be. Sikes explained that, when a comparable property differs in terms of location, size,

7

utility availability, access, and frontage from the subject property being appraised, an appraiser makes adjustments to the valuation of the subject property.

Sikes testified that, if he were to value the property taken by the State as a part of the Chanas' whole 7.765-acre tract, then he would not be valuing the property at its highest and best use. Sikes explained that property sells for more money per square foot when it is sold as a smaller tract of land. Sikes stated that, as a certified real estate appraiser, it was his job to determine the highest and best use of the Chana's property.

Based on his analysis, Sikes testified that the 2.385-acre economic unit, containing the condemned land, was worth $9.50 per square foot. Thus, the total value for the whole 2.385-acre economic unit would be $986,927. After discounting the portion of the economic unit that was not part of the condemnation, Sikes testified that his "compensation estimate," that is, the amount owed the Chanas for the fair market value of the 2.072 acres acquired by the State, was $922,256.

At trial, the State offered the testimony of David Dominy, a certified real estate appraiser. He testified that, in his opinion, the Chanas' property should be valued as one whole 7.765-acre piece of property and that the subject property taken by the State should be valued as a part of that whole. According to Dominy,

8

the market, in 2010, did not support dividing the Chanas' property into separate economic units.

According to Dominy, the highest and best use of the Chanas' property was "future commercial development" after "some of the other vacant land in the market's been absorbed and developed." He stated, "[T]hen, at that point in time I believe commercial development would be viable."

Dominy acknowledged that, in the area of the subject property, it had been a common practice to carve out and sell smaller economic units from larger tracts of land. But Dominy did not believe that, in 2010, this had been a viable option for the Chana's property. Dominy pointed out that there were large tracts of land around the Chanas' property, which were vacant. Dominy emphasized that the subject property also did not have much infrastructure in place. Because of the lack of infrastructure, Dominy indicated that the subject property was not comparable to certain properties in the area that had been carved out of larger tracts of land and sold as separate economic units for as much as $20.00 a square foot. When asked, Dominy opined that some of the comparable properties utilized by Sikes in his appraisal were not comparable to the subject property. Dominy indicated that these other properties had more infrastructures in place than the subject property and were more marketable as independent economic units.

9

To formulate his appraisal of the condemned property, Dominy relied on information from the sale of five properties, which he opined were comparable to the Chanas' property. Dominy utilized two of the same property sales as Sikes had used. The five properties relied on by Dominy ranged in size from .786 acres to 4.813 acres in size. The sales price of these properties ranged from $3.67 to $12.95 per square foot.

Based on his analysis, utilizing the five comparable land sales, Dominy opined that the Chanas' 7.76-acre tract was worth $5.00 per square foot. Using that figure, Dominy explained the additional calculations he performed to arrive at the amount owed the Chanas' to compensate them for the State's condemnation of the 2.072 acres of their property. Dominy testified that, in his opinion, the total compensation owed the Chanas' was $484,735.00.

The jury was presented the following question: "What do you determine to be the just compensation owed to the Chanas for the value of the part taken and damages to the remainder as of November 29, 2010?" The jury responded by awarding the Chanas $922,256.000, which is the same amount as Sikes had testified was owed to the Chanas.

The trial court rendered judgment on the jury's verdict. This appeal followed.

On appeal, the State identifies four issues. In its first two issues, the State asserts that the trial court abused its discretion by admitting Sikes' expert testimony regarding the value of the condemned property. Relatedly, in its third issue, the State complains that the trial court erred by admitting documentary evidence of five of the comparable property sales relied on by Sikes in forming his appraisal of the condemned property. Lastly, in its fourth issue, the State asserts that the trial court abused its discretion by refusing to admit a statement from a tax-protest hearing in 2010 at which the Chanas had sought to lower the tax assessed value on the 7.765-acre tract.

**Admissibility of Sikes's Opinion Testimony**

In issues one and two, the State claims that the trial court abused its discretion by admitting Sikes's opinion testimony regarding the compensation owed to the Chanas as a result of the State's taking.

**A. Standards Applicable to Expert Opinion Evidence**

If scientific, technical, or other specialized knowledge would assist the jury, a witness who is qualified as an expert by "knowledge, skill, experience, training, or education" may testify as an expert. TEX. R. EVID. 702. Such expert witness "may testify . . . in the form of an opinion or otherwise." *Id.*

11

The proponent of the expert's testimony bears the burden of showing that the expert's testimony is relevant and rests on a "reliable foundation." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995) (adopting analysis of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90, 113 S. Ct. 2786, 2795, (1993)). The trial court must make the threshold determination of whether the testimony meets both the relevancy and reliability standards for admissibility under Rule 702. *Robinson*, 923 S.W.2d at 557. We review the trial court's decision to admit the testimony for an abuse of discretion. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). Serving as an evidentiary gatekeeper by screening out irrelevant and unreliable expert evidence, the trial court has broad discretion to determine the admissibility of that evidence. *Robinson*, 923 S.W.2d 549 at 558. A court abuses its discretion when it acts without reference to any guiding rules or principles. *Id*

Appraisal expertise—as involved in this case—is a form of "'specialized knowledge [used to] assist the trier of fact to determine a fact in issue.'" *Guadalupe–Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002) (quoting TEX. R. EVID. 702). Thus, to be admissible, an appraisal expert's opinion must be relevant and reliable. *See id*.

12

The relevance requirement, which incorporates traditional relevancy analysis under Rules of Evidence 401 and 402, is met if the expert testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Robinson*, 923 S.W.2d at 556. Evidence that has no relationship to any issue in the case does not satisfy Rule 702; it is thus inadmissible under Rule 702, as well as under Rules 401 and 402. *Id.*

Rule 702's reliability requirement centers on the principles, research, and methodology underlying an expert's conclusions. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). "Under this requirement, expert testimony is unreliable if it is not grounded 'in the methods and procedures of science' and is no more than 'subjective belief or unsupported speculation.'" *Id.* (quoting *Robinson*, 923 S.W.2d at 557). If an expert relies on unreliable foundational data, any opinion drawn from that data likewise is unreliable. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001) (citing *Merrell Dow Pharm ., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)). Expert testimony also is unreliable if "there is too great an analytical gap between the data the expert relies upon and the opinion offered." *Zwahr*, 88 S.W.3d at 629.

**B. Project-Enhancement Rule**

The State asserts, "Sikes's opinion impermissibly relies on project enhancement because his economic unit is defined by the State's parameters of its acquisition area; therefore, his opinion is unreliable and inadmissible under Texas Rule of Evidence 702." In support of this assertion, the State relies on *Exxon Pipeline Company v. Zwahr*, 88 S.W.3d 623 (Tex. 2002).

In *Zwahr*, the supreme court determined whether the trial court had abused its discretion in admitting the opinion testimony of Brad Kangieser, a real estate appraisal expert. *See id.* at 626. Kangieser testified regarding the fair market value of a pipeline easement taken by condemnation by Exxon. *See id.* The supreme court restated the well-established legal standards applicable to valuing real property in a condemnation proceeding:

> Compensation for land taken by eminent domain is measured by the fair-market value of the land at the time of the taking. The general rule for determining fair-market value is the before-and-after rule, which requires measuring the difference in the value of the land immediately before and immediately after the taking. When, as here, only part of the land is taken for an easement, a partial taking occurs. In this situation, the before-and-after rule still applies, but compensation is measured by the market value of the part taken plus any diminution in value to the remainder of the land.
>
> In determining market value, the project-enhancement rule provides that the factfinder may not consider any enhancement to the value of the land-owner's property that results from the taking itself. This is because the objective of the judicial process in the

14

condemnation context is to make the landowner whole.   To compensate a landowner for value attributable to the condemnation project itself, however, would place the landowner in a better position than he would have enjoyed had there been no condemnation. . . .

On the other hand, the factfinder may consider the highest and best use to which the land taken can be adapted.  The existing use of the land, . . . is its presumed highest and best use, but the landowner can rebut this presumption by showing a reasonable probability that when the taking occurred, the property was adaptable and needed or would likely be needed in the near future for another use.

Finally, Texas law permits landowners to introduce testimony that the condemned land is a self-sufficient separate economic unit, independent from the remainder of the parent tract with a different highest and best use and different value from the remaining land.  In this situation, the market value of the severed land can be determined without reference to the remaining land.  But when the portion of the land taken by eminent domain cannot be considered as a separate economic unit, the before-and-after method requires determining market value by evaluating the taken land as a proportionate part of the remaining land.

*Id.* at 627–28 (internal citations omitted).

Applying these legal principles, the *Zwahr* court concluded that Kangieser's testimony was irrelevant, and therefore inadmissible, to determining the value of the land taken from the Zwahrs; thus, the trial court had abused its discretion in admitting Kangieser's testimony.  *Id.* at 631.  The *Zwahr* court provided two reasons for its holding: (1) Kangieser had impermissibly premised his valuation of the easement on the fact of Exxon's taking, in violation of the project-enhancement

15

rule, and (2) Kangieser had failed to utilize the before-and-after method in valuing the easement. *Id.* at 630–31.

The supreme court concluded that "Kangieser's testimony as a whole reveal[ed] that he premised his valuation on the fact of Exxon's condemnation, thus improperly including project enhancement in that valuation." *Id.* at 629. Of particular relevance to the *Zwahr* court was Kangieser's testimony that Exxon's condemnation defined the parameters of the economic unit. *Id.* at 629–30. Kangieser testified that the 1.01 acre easement acquired by Exxon was a separate economic unit, which had a "highest and best use" as a pipeline easement. *Id.* at 626, 629. Kangieser stated that Exxon's taking "created the economic unit." *Id.* at 630.

The court also emphasized that "[n]ot only did Kangieser rely on the Exxon project to establish a separate economic unit, he relied on Exxon's condemnation to assign a value to the condemned land." *Id.* The Exxon easement overlapped an existing easement owned by Koch by 82%, or approximately .82 acres. *Id.* Kangieser testified that before Exxon's project, the Zwahrs' interest in the .82 acres burdened by the Koch easement was of "negligible" or "nominal" value because it was an exclusive easement owned by Koch. *Id.* He then testified that once Exxon received Koch's consent to lay another pipeline within the easement,

16

the value of the .82–acres increased to $35,720 per acre, making the 1.01–acre

Exxon easement worth $36,077. *Id.* "In other words, had the Exxon project never

come along, the .82 acres would have continued to have no value to the Zwahrs."

*Id.* In addition, Kangieser "admitted twice that the value he placed on the land did

not exist before Exxon's condemnation." *Id.*

> Because Kangieser relied on Exxon's condemnation in establishing a
> separate economic unit and in assigning a value to that unit, his final
> opinion reflected enhancement in the land's value that occurred only
> because of the Exxon project itself. As explained earlier, value that
> exists because of the condemnation project is not, under the project-
> enhancement rule, value for which a landowner may recover. . . . In
> addition, after Kangieser identified the 1.01–acre tract as a separate
> economic unit, he evaluated it without reference to the Zwahrs' entire
> 49–acre tract. Thus at best, Kangieser determined the value of the
> easement to Exxon, not the value of the loss to the Zwahrs for the
> taking of the easement. . . . Kangieser failed to apply the before-and-
> after valuation method, which would have required him to evaluate
> the 1.01–acre as a proportionate part of the entire forty-nine acres.

*Id.* at 630–31 (citations omitted). The *Zwahr* court concluded that "Kangieser's

testimony was irrelevant to determining the value of the land taken from the

Zwahrs and therefore inadmissible under Texas Rule of Evidence 702." *Id* at 631.

The court held that the trial court had abused its discretion in admitting

Kangieser's testimony. *Id.*

In both *WestTex 66 Pipeline Co. v. Bulanek*, 213 S.W.3d 353 (Tex.—App.

Houston [1st Dist.] 2003), *aff'd as modified* 209 S.W.3d 98 (Tex. 2006) and

17

*WesTTex 66 Pipeline Co. v. Baltzell*, No. 01-01-00826-CV, 2003 WL 21665312 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) we were presented with the issue of whether the trial court had abused its discretion by admitting the testimony of a real estate appraisal expert who had testified regarding the value of a pipeline easement taken by condemnation. In each case, the pipeline company, WesTTex, objected to the testimony, asserting that the experts had impermissibly included project enhancement in their appraisals by relying on WesTTex's condemnation to define the economic unit and to compute the easement's fair-market value. *Baltzell*, 2003 WL 21665312 at *2; *Bulanek*, 213 S.W.3d at 357. We agreed.

As in *Zwahr*, the experts in *Baltzell* and in *Bulanek* testified that the pipeline easements being acquired were separate economic units, thereby demonstrating that the condemnation involved in each case defined the parameters of the economic unit. *See Zwahr*, 88 S.W.3d at 629; *Baltzell*, 2003 WL 21665312 at *5; *Bulanek*, 213 S.W.3d at 357. From the experts' testimony, it was clear that the separate economic unit derived from the condemnation itself and would not have existed independent of the condemnation. *Baltzell*, 2003 WL 21665312 at *5; *Bulanek*, 213 S.W.3d at 357.

In addition, as in *Zwahr*, the experts' testimony in *Baltzell* and in *Bulanek* indicated that, not only had they relied on the condemnation to define the

18

economic unit, they had also relied on the condemnation in each case to assign value. *Baltzell*, 2003 WL 21665312 at *6–7; *Bulanek*, 213 S.W.3d at 358. In other words, the experts had improperly assessed the value of the easements to WesTTex, not the loss suffered by the landowners. *Baltzell*, 2003 WL 21665312 at *7; *Bulanek*, 213 S.W.3d at 358. We also concluded that the experts failed to employ the before-and-after valuation method, which, as stated in *Zwahr*, is the appropriate method to apply in pipeline condemnation proceedings in which the subject land is not a separate economic unit. *Baltzell*, 2003 WL 21665312 at *7; *Bulanek*, 213 S.W.3d at 358.

Applying the standards enunciated in *Zwahr*, we concluded in both *Baltzell* and *Bulanek* that the experts' opinions were irrelevant to determining the value of the property taken by WesTTex and, therefore, the testimony was inadmissible under Rule of Evidence 702. *Baltzell*, 2003 WL 21665312 at *7; *Bulanek*, 213 S.W.3d at 358. We held that the trial courts had abused their discretion in admitting the expert appraisal testimony. *See Baltzell*, 2003 WL 21665312 at *8; *Bulanek*, 213 S.W.3d at 358–59.

Here, citing *Zwahr*, *Baltzell*, and *Bulanek*, the State asserts that "Sikes' appraisal methodology defines an economic unit created from the State's condemnation itself, which violates the project enhancement rule." The State

19

points out that the boundaries of the 2.385-acre economic unit appraised by Sikes has the same parameters as the original acquisition the State had planned to take for the detention pond. At the Chanas' request, the State did not take a 30-foot strip at the back of the originally-defined acquisition to provide drainage access to Dinner Creek for the reminder of the Chanas' property. This reduced the size of the State's acquisition from the 2.385 acres originally planned to the 2.072 acres that was ultimately condemned.

The State points to Sikes's testimony on direct examination in which he stated that the reason he valued the eastern portion of the Chanas' 7.765-acre tract was because "that's what's actually being taken here." Also, near the end of his direct examination, when asked whether he was "valuing that eastern [part of the property] because that's where the state . . . took the property?" He answered, "Correct."

The State further points to Sikes's testimony on cross-examination in which he acknowledged that the economic unit, appraised by him, appeared to be nearly identical to the State's originally-planned acquisition. He also acknowledged that, had the State not agreed to move the southern boundary, the economic unit appraised by him would have had the same parameters as the State's acquisition.

20

It is, however, useful to place the testimony cited by the State in context. In this respect, Sikes testified as follows on cross-examination:

Q. [I]t's your testimony that when you determine the size and shape of this separate economic unit that would sell in the open place, you did that based upon market data that you identified and not on the acquisition?

A. I based it upon market data, you know, that the property would be subdivided into three economic units.

Q. And you further said it's going to be 2.3-acre—three point—2.385-acre tract?

A. Yeah, that's my opinion.

Q. Almost identical boundaries as the State's acquisition?

A. That's my opinion.

Q. And you did that based on market data, not the acquisition itself?

A. I looked at the market and how the property would be developed to its highest and best use.

Q. And the State's acquisition had absolutely no influence on your articulation of the boundaries of your separate economic unit?

A. It's—it is the economic unit.

Q. But that's not what I asked. I asked you whether the State's acquisition had any influence on your articulation of the parameters of your separate economic unit?

A. No, it didn't.

Q. So, it's just a coincidence that they're virtually identical?

21

A. Well, yeah. It's not a coincidence. It's based upon what's happening in the market.

Q. That's right. It's not based on the survey order here?

A. No. It's not based upon the survey; but, you know, as we started the process, the role is to estimate just compensation to the Chanas.

Sikes's testimony on cross-examination was consistent with his testimony given on direct examination. During direct examination, testified as follows:

Q. Did you do that analysis with regard to your appraisal of the Chana property?

A. I did.

Q. And what did you determine was the highest and best use for the Chana property?

A. A commercial development. The vacant land would be developed commercially.

Q. Is this also—well, let me ask you this, first of all: Are you, in fact, required to value the Chana property as though it's put to its highest and best use in this proceeding?

A. That's all appraisals, by the definition of market value.

Q. Okay. So, you determine a commercial use. Does that—is this also—the highest and best use analysis also where you evaluate the economic unit concept?

A. Exactly. They have over a 7-acre tract, but if you look in the marketplace how the market was developed—you can look right down the road and see these economic units cut out of this larger parcel. That's how this property would be developed. That would be

22

the highest and best use of the property.   So, in my opinion, the economic use is the highest and best use.

Q. The economic unit—

A. Yes.

Q. —is the highest and best use?

A. Economic unit.

Q. Okay. And during the—there's been some suggestion, maybe in opening statement or whatnot, that you—your economic unit has some problems because it's all the way on the eastern side of the property.  Can you explain to the jury your overall analysis and why you valued the part on the eastern portion of the property?

A. Well, very commonsensical.  That's what's actually being taken here.  The corner in Enchanted Oak is not being taken.  We're here to estimate the value of that acquisition. If you look at the property, where it's located, the size of the parent tract, it could be cut up into three different tracts.  So, I'm looking at the economic unit based upon, okay, I've got a 7-acre parent tract; but if I look at the properties in the marketplace, everybody's selling and developing smaller tracts out of the larger tract. I think the highest and best use of the Chanas' [property] would be the exact same, what the market is doing.

Q. And so, when you say you determined an economic unit, you actually are—did you speak in terms of the whole property being divided into multiple economic units?

A. Yes.

Q. Okay.  So, there would be one—an economic unit at the hard corner of Enchanted Creek?

A. I think you're—you're—if you look at the Chana property and look at how the property was developed across the street, you can see how it's cut up.

Q. But we're talking in this lawsuit about the eastern and that—and you valued the eastern economic unit.

A. Correct. I didn't value anything to the west of the . . . [line] there. I just valued that component, that economic unit.

Q. Okay. And why did you value the eastern economic unit?

A. Well, it's my opinion that that property can stand on its own. It doesn't need the entire 7 acres. And if you look at other development that's. You know, just down the street from us, that's how those properties were developed.

Q. Okay. But I'm kind of thinking even more basic than that. You say two or three—three or four economic units on the Chana property. That would be the highest and best use.

A. You know multiple economic units.

Q. Okay. But why are we talking about the ones to the east?

A. Because they're not taking the ones to the west.

Q. Okay. So, in order to assist the jury when determining value, you valued what the State is taking?

A. Right, because it can stand alone.

Q. If the State were taking the hard corner at enchanted Creek, would you have valued an economic unit there?

A. That would be a different analysis.

Q. Okay. But it would be—would it be correct to say that you only carved out one economic unit from this property, and it's all the way to the eastern boundary of the property?

A. Correct.

Q. Would that be correct to say?

A. That would be correct.

Q. Okay. But—make sure—I don't think we're communicating.

A. Okay.

Q. Overall, you would carve up the Chana property into multiple economic units?

A. Yeah. I think of the 7 acres, you'd have three economic units—three different pad sites.

Q. Okay. And all my question is: If there's a suggestion that you're only creating one economic unit on the property and it's all the way to the eastern boundary, that wouldn't be correct, would it?

A. No.

Q. But you valued that one because that's where they're taking it?

A. Exact—exactly. And they're not taking the—the other economic units.

Sikes's testimony stands in contrast to the testimony of the appraisal expert in *Zwahr* and in *Baltzell*. In *Zwahr*, the landowners' expert testified that "Exxon's condemnation 'created the economic unit,'" and that the 1.01 acre "did not exist until after the condemnation." *See Zwahr*, 88 S.W.3d at 630.

25

Similarly, in *Baltzell*, the landowners' experts determined the economic unit to be the same 5.47 acres of land that had been condemned for a pipeline easement. 2003 WL 21665312 at *7. One of landowners' appraisal experts testified that "WesTTex created the economic unit that I valued." *Id.* at *5. Their other expert testified that he adopted the pipeline easement as his economic unit and stated that pipeline's placement on the 5.47–acre strip of land was what made it a separate economic unit. *Id.*

Here, unlike the experts in *Zwahr* and *Baltzell*, Sikes expressly denied using the State's original condemnation survey as the basis for his opinion regarding the boundaries of the economic unit. In addition, Sikes explained why he appraised the eastern section of the Chanas' property, taken by the State, as a separate economic unit; that is, he explained the basis for his opinion.

Sikes testified that the highest and best use for the Chanas' 7.765 acre tract was to subdivide it into three separate, independent tracts to be sold individually for commercial use. Sikes testified that this is how other comparable properties in the area were selling at the relevant time. Larger properties like the Chanas were not selling as a whole but were being divided and sold as smaller properties for commercial use. Sikes stated that he appraised only the eastern most of the three

economic units because that economic unit contains the property condemned by the State.

We conclude that the trial court had ample evidence to reject the State's assertion that Sikes's testimony violated the project-enhancement rule because the economic unit appraised by Sikes had the same dimensions as the original condemnation planned by the State. We hold that the trial court did not abuse its discretion by refusing to exclude Sikes's testimony on the ground that his appraisal violated the project enhancement rule as set forth in *Zwahr*.

## C.    Separate Economic Unit

The State further assails Sikes's valuation methodology by asserting that Sikes should not have evaluated the condemned 2.072 acres as part of a separate 2.385-acre economic unit; rather, the State asserts that Sikes should have evaluated the condemned property as a proportionate part of the entire 7.765 acres owned by the Chanas. To support this assertion, the State relies on the following language from *Zwahr*:

> Texas law permits landowners to introduce testimony that the condemned land is a self-sufficient separate economic unit, independent from the remainder of the parent tract with a different highest and best use and different value from the remaining land. In this situation, the market value of the severed land can be determined without reference to the remaining land. But when the portion of the land taken by eminent domain cannot be considered as a separate economic unit, the before-and-after method requires determining

27

market value by evaluating the taken land as a proportionate part of the remaining land.

*Zwahr*, 88 S.W.3d at 628 (citations omitted). The State first asserts that, pursuant to the foregoing language in *Zwahr*, Sikes's testimony did not establish that the 2.385-acre tract he appraised was a separate economic unit because it did not have a different highest and best use from the remainder of the Chanas' property.

As shown above, Sikes testified that the highest and best use of the Chanas' 7.765 acres was dividing it into three separate, self-sufficient tracts. The highest and best use for each of these individual parcels, including the one appraised by Sikes, is commercial development. Under this methodology, there is no "remaining property"; rather, the whole property is comprised of three separate, self-sufficient units. Nonetheless, Sikes's testimony indicated that the highest and best use of the 7.765-acre parent tract (division into three parcels) is not the same as the highest and best use for the economic unit appraised by Sikes (commercial development).

The State further asserts that Sikes's testimony failed to show that the appraised economic unit was self-sufficient or independent from the remaining acreage. The State points to Sikes's testimony in which he explained how access to the appraised economic unit could be gained. Sikes stated that there would be a driveway on FM 529 for direct access. He also stated that access could be gained

from Enchanted Creek Drive by cross-access over the two economic units to be developed on the Chanas' property. Sikes testified: "[Y]ou're going to have a portion of access off 529; but since the Chanas own all that other property, you're going to have cross access over to Enchanted [Creek], just like many of these tracts in the marketplace have cross access."

The State argues that the appraised economic unit was not self-sufficient because cross-access to the unit would need to be through the other portions of the Chanas' property. We disagree that such evidence showed that the appraised economic unit was not independent and self-sufficient. Sikes testified that the economic unit would have its own direct access from FM 529, a major thoroughfare. In addition, Sikes indicated that, not only is cross-access common in the market between economic units, it is beneficial to the economic unit and adds to its value: He testified:

> You'd have what would be cross access around the front so you could drive from the east to the west. Economic units, they like synergy. They share customers. If you look at the properties right up here (indicating), there is an access drive you can see there. And there's also an access drive back here (indicating). That's how that property was developed. You might have rear access, as well; but you're going to try to—you know, properties with more access are worth more than properties with less access, all other things being equal.

The State further assails Sikes's opinion that the appraised economic unit was self-sufficient on the ground that "basic infrastructure," such as sewer and

29

water, had not been developed on the unit. However, a review of the record reveals that the State's claim of the lack of basic infrastructure is not entirely accurate.

The State points out that, although a sanitary sewer line existed on the western boundary of the Chanas' 7.765-acre tract, the line would need to be extended 550 feet to reach the appraised economic unit. However, Sikes testified, "That's [i.e., 550 feet] fairly close for this type of development."

The evidence also showed that a water line ran along the northern boundary of the appraised economic unit and a storm sewer existed on the property's southern border. The evidence further showed that the property was within a municipal utility district (MUD). Sikes testified that much of the costs of developing the infrastructure were reimbursable from the MUD, although he acknowledged that reimbursement was not guaranteed.

In addition, the State assails Sikes's appraisal of the property as a separate economic unit on the ground that the Chanas' property had not been previously partitioned or marketed as a separate 2.385-acre tract. The State also asserts that this rendered Sikes's opinion "too speculative to be admitted as direct evidence of

market value."[1]  In support of this assertion, the State relies on *State v. Willey*, 360 S.W.2d 524 (Tex. 1962) and *City of Harlingen v. Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001).  We agree with the Chanas that these cases are distinguishable.

In *Willey*, the landowner sought to offer evidence that the best and highest use of a 3-acre tract, which had been condemned out of a 104-acre tract, was "subdivision into residential homesites, with some commercial sites."  *State v. Willey*, 351 S.W.2d 904, 905 (Tex. Civ. App.—Waco 1961), *rev'd*, 360 S.W.2d 524 (Tex. 1962).  The Supreme Court of Texas held that this evidence was not admissible because "at the time of the taking . . . there had been no subdivision or development of the 104–acre tract in question."  *Willey*, 360 S.W.2d at 524.  The court also held that "one seeking to prove the value of such a tract of land may not show what the price of the lots would be if subdivided, or show the price for which already subdivided lots were selling."  *Id.* at 525.

Here, unlike in *Willey*, Sikes's valuation methodology is not based on selling the property as a residential subdivision; rather, it is based on "something much simpler."  *In re State*, 355 S.W.3d 611, 616 (Tex. 2011) (holding that *Willey* did not bar admittance of landowner's evidence that highest and best use of property

---

[1]  This argument was made under the State's third issue, but because it is related to argument made under the State's second issue, we discuss it here.

was partitioning it into separate parcels to be sold as highway frontage commercial property). Sikes testified that the highest and best use of the Chanas' entire property was partitioning it into three separate tracts, which could each be sold for commercial development. Sikes explained that his opinion was supported by what he found was happening in the market in the area surrounding the property. He stated that larger parcels, such as the Chanas' 7.765-acre tract, were not being sold as whole properties for future development. Rather, the sales in the area showed that smaller tracts were being sold from larger tracts to be used for development of a single commercial enterprise. Because it is distinguishable, the holding in *Willey* does not negate Sikes's designation of the 2.385-acre tract as a separate economic unit or render his opinion speculative.

*Sharboneau* involved the condemnation of a 10-acre tract of land to be used for a city park. *See* 48 S.W.3d at 180. Before trial, the parties stipulated that the highest and best use for the land was a residential subdivision. *Id.* At trial, the landowners' expert used the subdivision development method to appraise the condemned land. *Id.* "This method values an undeveloped tract by calculating what a developer could expect to realize from sales of individual lots, taking into account the costs of development and discounting future revenues to present value." *Id.* The analysis employed by the landowner's expert under the

32

subdivision development method was complicated and complex.  *See id.* at 180–81.

In contrast, the city's expert in *Sharboneau* used the comparable-sales method of appraisal to determine the land's value.  *Id.*  The city's expert offered evidence of three comparable land sales that were suitable for residential development.  *Id.*  The city's expert determined the value of the condemned property after making adjustments to the three comparable properties to compensate for their varying characteristics.  *Id.*

The *Sharboneau* court explained that the subdivision development method is distinct from the comparable sales approach.  *Id.* at 183–84.  "Although subdivision development analysis requires the appraiser to examine the market for ready-to-build lots, such properties are not comparable to the larger, unsubdivided property actually being appraised.

The court also recognized that "[c]ourts have long favored the comparable sales approach when determining the market value of real property."  *Id.* at 182.  The court continued,

> If the goal of an appraisal is to ascertain market value, then logically there can be no better guide than the prices that willing buyers and sellers actually negotiate in the relevant market.  Under a comparable sales analysis, the appraiser finds data for sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property.

*Id.*

Ultimately, the *Sharboneau* court recognized that the subdivision development method may be a valid appraisal methodology for undeveloped land. *Id.* at 186. However, the court held the subdivision development method could not serve as a basis for the judgment in that case because the expert's opinion "did not demonstrate what a willing buyer would pay to a willing seller in the relevant market"; thus it was not reliable or relevant. *Id.*

Unlike the landowner's expert in *Sharboneau*, Sikes did not appraise the condemned property in this case utilizing the subdivision development method. Rather, as the city's expert did in *Sharboneau*, Sikes appraised the property using the comparable-sales method.

In addition, we note that the Supreme Court of Texas distinguished *Sharboneau* in a case in which the landowner asserted that the highest and best use of a 39-acre tract, condemned out of a 185-acre tract, was to partition the 39-acres into several individual tracts that could be sold as highway frontage commercial property. *In re State*, 355 S.W.3d at 615–16. Distinguishing *Sharboneau,* the *State* court wrote:

> In a 10–acre tract like that considered in *Sharboneau*, it is unlikely that a 1/44th-tract lot would be bought for residential purposes unless the entirety of the residential subdivision had been planned and

34

created, and substantial funds had been invested. Inferences like these are unnecessary to support the sale of parcels such as those into which the [landowners] divided their property. The costs of dividing raw land are insubstantial. If the [landowners] were to offer evidence that the typical size of highway-frontage commercial parcels was similar to their subdivided parcels, and that those parcels were similarly appropriate for that use, it would not be speculative to permit them to admit valuation evidence on that basis. Of course, the State would be permitted to offer its own evidence that the land was best valued as a single unit.

*Id.* at 616.

This reasoning also applies in this case. Valuing the separate economic unit appraised by Sikes does not involve the same inferences that would be required to value a residential tract in an undeveloped residential subdivision. *See id.* Here, through Sikes, the Chanas offered evidence showing that similarly sized and situated parcels of land, comparable to the economic unit appraised by Sikes, were being purchased in the vicinity for commercial development.[2] Thus, it was not speculative for the Chanas to offer valuation evidence based on the premise that the appraised economic unit was a separate, self-sufficient unit. *See id.* In short, the holding in *Sharboneau* does not serve to render the basis for Sikes's opinion speculative. We hold that the State has not shown that the trial court abused its discretion by refusing to grant its motion to exclude the opinion testimony of Sikes

---

[2] As discussed *infra*, the State objects to the admission of only five out of the ten comparable land sales relied on by Sikes.

on the basis that the 2.385-acre tract, containing the condemned property, could not be valued as a separate economic unit.

We overrule the State's first and second issues.

**Admissibility of Five Comparable Property Sales**

In its third issue, the State asserts that the trial court abused its discretion by admitting into evidence certain property sales. Through Sikes, the Chanas offered into evidence ten property sales, which they asserted were comparable to the economic unit appraised by Sikes. The State objected to the admission of five of these sales: Chana Sale Numbers 4, 5, 6, 8, and 9. The State asserted that these five sales were not comparable to the condemned property because each sale had involved land that was part of an existing commercial subdivision, located at a busy intersection, with developed ready-to-build "pad sites," and infrastructure already in place. *See Sharboneau*, 48 S.W.3d at 182 ("Comparable sales must . . . take place near in time to the condemnation, occur in the vicinity of the condemned property, and involve land with similar characteristics."). The State averred that, in contrast, the Chanas' property was "raw," "undeveloped," and not subdivided. The State has also asserted that it would be unlikely that the appraised economic unit would be the first parcel to sell out of the Chanas' land because it is an interior tract, not the corner tract of the property.

36

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *Alvarado*, 897 S.W.2d at 754.

A trial court's error in admitting evidence is reversible only if the error probably (though not necessarily) resulted in an improper judgment. *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 883 (Tex. 2014); *see also* TEX. R. APP. P. 44.1(a)(1) (providing that error does not result in reversal unless it "(1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals"). To determine whether the trial court's error was harmful, we review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted. *Kia Motors Corp.*, 432 S.W.3d at 883. Error in admitting evidence is generally harmless if the objecting party later permits the same or similar evidence to be introduced without objection or the contested evidence is merely cumulative of properly admitted evidence and is not controlling on a material issue dispositive of the case. *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *Interstate Northborough P'ship v.*

37

*State*, 66 S.W.3d 213, 220 (Tex. 2001); *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984).

For purposes of analysis, we will presume, without deciding, that the trial court abused its discretion by admitting Chana Sale Numbers 4, 5, 6, 8, and 9. Although it has alleged that the trial court erred by admitting the five comparable land sales, the State has not explained how this alleged error caused harm. *See Cortez v. HCCI–San Antonio, Inc*., 131 S.W.3d 113, 119 (Tex. App.—San Antonio 2004), *aff'd*, 159 S.W .3d 87 (Tex. 2005) (explaining that on appeal appellant has burden of showing how he or she was harmed by the exclusion of evidence). Nonetheless, we turn to the record to determine whether harm resulted from the admittance of the complained-of evidence.

The State does mention that Sikes relied on these land sales as examples supporting his statement that the trend in the market was to carve out and sell smaller tracts of land from bigger tracts for commercial development. This in turn supported Sikes' opinion that the appraised tract was a separate economic unit. However, there were other sales admitted into evidence involving a sale of a smaller tract sold out of a larger tract. Chana Sale Number 1, of which the State does not complain, also involved the sale of a parcel of land, 2.167 acres, that was sold from a larger tract. This tract was less than one mile from the Chanas' land,

was equivalent in size to the appraised economic unit, and sold for $19.07 per square foot.

In addition, through its expert, Dominy, the State also offered into evidence a sale in which a smaller tract of land had been sold out a larger tract. The State's Sale Number 1 involved the sale of a 1.19-acre tract that sat at an intersection. That tract had been sold off from a larger tract of land. In addition, on cross-examination, Dominy acknowledged that the 1.19-acre tract had not been the first smaller tract to sell from that larger tract. He admitted that the first smaller tract to sell had been a tract "away from the intersection." As the Chanas point out, a tract "away from the intersection" would be similarly situated to the economic unit appraised by Sikes in this case.

In addition, Chana Sale Numbers 1, 2, 3, 7, and 10, of which the State does not complain, also provided support for the jury's monetary award. These land sales involved property that sold from $7.70 to $19.07 per square foot. Sikes testified that he valued the condemned property to be worth $9.50 per square foot with the total compensation due the Chanas to be $922,256.00. Thus, Chana Sale Numbers 1, 2, 3, 7, and 10 support the monetary award.

We hold that the trial court's error, if any, in admitting Chana Sale Numbers 4, 5, 6, 8, and 9 was harmless error. *See* TEX. R. APP. P. 44.1(a)(1). We overrule the State's third issue.

## Exclusion of Tax Protest Records

In its fourth issue, the State asserts that the trial court abused its discretion when it excluded testimony from a tax-protest hearing in which the Chanas challenged the taxes assessed on the property.

Four months before the date of the taking in this case, Brandon Fisher, a tax consultant, appeared on behalf of the Chanas before the Harris County Appraisal Review Board to protest the taxes assessed on the Chanas' property. Fisher stated under oath at the hearing that the market value of the Chanas' 7.765-acre tract was $3.24 per square foot.

The State sought to admit the record of the tax-protest hearing, asserting that Fisher's statement, as to the market value of the property, was admissible as an admission or a statement against interest. *See* TEX. R. EVID. 801(e). The Chanas filed a motion to exclude the tax-protest hearing record. They asserted that, pursuant to Rule of Evidence 403, the probative value of the evidence was outweighed by the danger of unfair prejudice and would confuse the issues for the jury. *See* TEX. R. EVID. 403.

Following a pretrial hearing, the trial court granted the Chanas' motion to exclude tax protest hearing record. The trial court stated that "using . . . Rule 403, I do believe the probative value of this tax protest record is substantially outweighed by the risk of unduly prejudice[ing] and confusing the jury."

During trial, the State requested the trial court to reconsider its ruling on the Chanas' motion to exclude the tax protest evidence. The trial court denied the motion to reconsider. The State made an offer of proof for the appellate record with respect to the transcript of the tax-protest hearing.

On appeal, the State asserts that the trial court erred by excluding the evidence because "[i]t is clearly established under Texas law that a property owner's prior statements regarding fair market value of the owner's property are admissible as substantive evidence in an eminent domain proceeding when the property owner participates in or adopts the declared value." The State further avers, "This rule applies even where the prior statements of value were generated for tax purposes."

In their brief, the Chanas do not dispute "that evidence of a tax rendition valuation can be admissible as an admission, or a statement against interest . . . ." The Chanas assert, however, that the State sought to admit more than just Fisher's statement of the property's value. Rather, at the hearing in the trial court, the State

41

made clear that it sought to admit the entire transcript of the tax protest hearing into evidence.[3]

At the tax-protest hearing, Fisher sought to lower the tax assessed value on the Chana's entire 7.785-acre property to $3.24 per square foot. To support this valuation, Fisher relied on three property sales and six property listings in the area of the Chanas' property. Before the appraisal review board, Fisher testified as follows:

> I'm looking at some comparable properties in the area and I found three sales, six listings. I think the listings definitely overpower the sales. In fact, there was only a couple of indicated sales in the area, especially because it's hard to find sales in this size. Subject's almost eight acres. Most of the properties in the area that are selling are much smaller tracts. Based on the listings of these properties and three sales, the median indicated value per square foot is $3.24 a square [foot], divide that by the subject property, gives me a value of [$] 1,095,975.
>
> The next couple pages are just a break down of their sales, their size, and also the listings, as well. . . .

---

[3]     At the pretrial hearing on the motion to exclude, the trial court asked, "The records we are talking about here are not only their Exhibit D, right, the hearing affidavit, but you're also talking about [the] testimony on the records?" The State responded that it had brought the file from the proceeding, including an audio recording of the tax protest hearing. The trial court then asked, "[P]lease tell me what kind of records we're talking about. So in addition to the audio-recording, what else are we talking about?" The State responded that there was "[a] sworn affidavit from Mr. Fisher testifying as to market value of the property . . . [a]nd then the hearing evidence that they submitted in support of his opinion where he opines that the property is valued at $3.24 per square foot . . . ." Later, during its offer of proof, the State offered the entire transcript from the tax protest hearing.

Fisher then proceeded to discuss a number of the comparable sales and listings on which he based his valuation.

As shown in the foregoing excerpt, Fisher testified that he formulated his opinion regarding the value of the property based—not only on what he regarded as comparable sales—but also on property listings, which he stated "overpowered" the comparable sales information. The Chanas correctly point out that, in a condemnation suit, evidence of the price for which a similar property is being offered for sale is not admissible evidence to establish the fair market value of the condemned property. We have previously recognized, "The law is well settled that unaccepted offers to buy or sell are incompetent evidence of land value in condemnation suits." *State v. Clevenger*, 384 S.W.2d 207, 209 (Tex. Civ. App.—Houston 1964, writ ref'd n.r.e.) (citing *Hanks v. Gulf, Colo. & S. F. Ry. Co.*, 320 S.W.2d 333, 336 (Tex. 1959); *Taub v. Hous. Indep. School Dist.*, 339 S.W.2d 227, 229 (Tex. Civ. App.—Eastland 1960, writ ref'd n.r.e.); *Loumparoff v. Housing Auth. of City of Dall.*, 261 S.W.2d 224, 228 (Tex. Civ. App.—Dallas 1953, no writ); *State v. Layton*, 147 S.W.2d 515, 517 229 (Tex. Civ. App.—Eastland 1941, no writ)); *accord Sullivan v. Missouri, K. & T. Ry. Co. of Tex.*, 68 S.W. 745 (Tex. Civ. App. 1902) (stating in condemnation case, "It is not competent as evidence of

value to prove offers for adjacent and similar property, or the price at which the owners of such property have offered it for sale").

We agree with the Chanas that the evidence of the listing prices, contained within the tax-hearing transcript, was inadmissible. *See Clevenger*, 384 S.W.2d at 209. The State made no attempt to segregate this inadmissible evidence from the admissible evidence from the tax hearing. "It is well settled that where evidence is offered as a whole, only a part of which is admissible, the court does not commit error in sustaining an objection to such testimony, and in such case it is not the duty of the court or the party objecting thereto to separate the admissible from the inadmissible." *Perry v. Tex. Mun. Power Agency*, 667 S.W.2d 259, 265 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Thus, we hold that the trial court did not abuse its discretion by excluding the record from tax-protest hearing.[4]

We overrule the State's fourth issue.

---

[4] Although the trial court stated that it excluded the tax hearing evidence based on Rule of Evidence 403, we must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *See Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Oyster Creek Fin. Corp. v. Richwood Invs. II, Inc.*, 176 S.W.3d 307, 317 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

44

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Justices Jennings, Higley, and Huddle.