**Affirmed and Opinion filed August 25, 2016.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-15-00077-CV

_____

### HARRIS COUNTY FLOOD CONTROL DISTRICT, Appellant

### V.

### H. BEN TAUB, KITCHCO REALTY, LTD., METCO REALTY, LTD., AND TEXAN LAND AND CATTLE II, LTD, Appellees

**On Appeal from the County Civil Court at Law No. 2
Harris County, Texas
Trial Court Cause No. 955392**

## O P I N I O N

In this condemnation case, Harris County Flood Control District ("the District") appeals the judgment rendered on the jury's finding valuing the subject property at $11,636,238.00 on the date of the taking. According to the District, the trial court abused its discretion in admitting comparable-sales evidence of five other property transactions and in rendering judgment on the jury's verdict, which tracked expert testimony relying on some or all of those transactions. We conclude

that the trial court abused its discretion in admitting evidence of an option contract and of a sale to a school district having the power to condemn property. Because other comparable-sales evidence supported the expert testimony and the verdict, we conclude that these errors were harmless, and we affirm the trial court's judgment.

## I. BACKGROUND

H. Ben Taub and three entities associated with the Taub family owned a heavily wooded tract of about 99 acres in Deer Park, Harris County, Texas.[1] A drainage easement divided the property into a northern section of about 42 acres and a southern section of about 56 acres.[2] The District condemned the 42-acre tract, and the special commissioners determined that the property's value was $9 million. The District paid this amount into the registry of the court on July 28, 2010, thus establishing that as the date of the taking. The District's appeal to the county civil court at law was by trial de novo.

The District contends that the trial court erred in admitting comparable-sales evidence of five real-estate transactions. Taub was a party to three of those transactions, and the remaining transactions were sales of two properties, each of which served as the site for a hotel. We describe the transactions below.

---

[1] The three entities are Kitchco Realty, Ltd., Metco Realty Ltd., and Texan Land & Cattle II, Ltd. Those companies are Taub's co-appellees, but because their interests are aligned with Taub's, we refer to Taub as though he were the sole appellee. Taub died shortly before trial and a scire facias was issued to the co-executors of his estate, but the record contains neither a return of service nor the co-executors' answer, and the judgment names Taub among the prevailing parties. Thus, just as the parties have done, we will ignore the distinction between the deceased defendant and his estate or its co-executors.

[2] The northern section's size was stated differently in different documents. The original "Frantz" sales contract, discussed *infra*, describes this section as being 42.7299 acres. The first amendment to that contract, the jury charge, and many of the witnesses referred to it as a 42.741-acre tract. The petition in condemnation and the judgment characterize it as a 42.8203-acre tract.

2

## A. The Frantz Contract

In September 2007, Taub executed an agreement to sell both his 42-acre lot and his 56-acre lot to John E. Frantz.[3] They agreed that Frantz would pay $3.00 per square foot for the property conveyed.[4] They also agreed that Frantz would have until the end of the year to investigate the property, and that if he terminated the contract in writing before the end of that period, then his $50,000.00 earnest-money payment would be refunded. The contract stated that the sale was to close on January 30, 2008.

In early December 2007, Frantz went to Deer Park's office of public works to investigate the utilities available to the site. After he left, Deer Park's city manager called and invited him to a meeting on December 11, 2007. Deer Park's mayor, its city manager, two or three people from the District, Frantz, and Frantz's son attended. The group told the Frantzes that the District wanted to acquire part of Taub's property as a site for a detention pond. There is conflicting evidence about whether the District told Frantz at that time that it wanted the 42-acre section.

On December 17, 2007, Frantz and Taub amended their contract; we refer to the first amended contract as the "Frantz contract." In the amendment, Frantz and Taub agreed that Frantz would pay $3.00 per square foot for the 56-acre tract and $6.00 per square foot for the 42-acre tract. They also pushed back the property-investigation deadline and the closing date by two months. The contract was amended seven more times to extend deadlines while the parties waited to see

---

[3] Although terms such as "tract," "section," "lot" and the like may be used in legal descriptions of property, we use the terms in their ordinary sense.

[4] Taub had the right to retain up to ten acres from the conveyance, but the parties agreed that if Taub did so, then that amount would be excluded from the calculation of the purchase price.

3

whether the District would condemn the 42-acre section of the property, but the price remained the same.

## B.     The Kinder Morgan Contract

During this time, Taub executed an option agreement with Kinder Morgan Texas Pipeline, LLC ("the Kinder Morgan contract"). Kinder Morgan owned the property that separated the 42-acre tract from East Boulevard in Deer Park. Taub sought a 60-foot-wide strip of land to provide access from East Boulevard to the 42-acre tract. Under the terms of that contract, Taub paid $53,280.00 for a one-year option to buy the strip of land for $532,800.00—the equivalent of $6.44 per square foot—and the option was renewable for one year at the same price. Kinder Morgan agreed that if Taub exercised the option, then all of the money he paid for the option would be applied to the sale. The original contract was executed in December 2008, and although Taub renewed the option, he did not ultimately buy the land.

## C.     The School Sale

Also during this time, Taub negotiated to sell the 56-acre section of the property to Deer Park Independent School District for $4.50 per square foot ("the School sale"). To allow that sale to go through, Frantz and Taub agreed to terminate their sales contract. The School sale agreement was executed in March 2010 and closed the same month.

## D.     The Hotel Sales

The jury also heard evidence about two properties sold for development as hotels. The site of the future Candlewood Suites hotel was approximately 2.2 acres and sold for $7.42 per square foot. The site of the La Quinta hotel was about the same size, and was sold for $5.00 per square foot.

4

## E. The Expert Testimony

Taub retained three experts to testify regarding the property's market value, but called only two of them—Mark Sikes and Wayne Baer—to testify at trial. Both experts used the comparable-sales method, with Sikes relying on ten and Baer relying on eight transactions. Sikes and Baer each relied on the Frantz contract, the Kinder Morgan contract, the School sale, and the Candlewood Suites sale; neither of them relied on the La Quinta sale as a comparable sale. Sikes and Baer instead described the La Quinta sale as a sale on which the School's consultant relied in determining the purchase price for the 56 acres that were the subject of the School sale.

Sikes opined that, after determining whether each of the properties he used as a comparable sale was superior or inferior to the subject property and adjusting the sales accordingly, the subject property's market value on the date of the taking was $6.25 per square foot, for a total of $11,636,238.00. Baer opined that the subject property's market value was $6.00 per square foot, for a total of $11,170,000.00. The District's expert Alan Dominy used nine comparable sales ranging from $1.34 to $3.67 per square foot, and opined that the market value of the 42-acre tract was $2,580,506.00.

Although Taub did not call his third expert Clinton Bogart as a witness at trial, the District did. The District elicited Bogart's testimony that he used the La Quinta sale as a comparable sale when calculating the value of the 42-acre tract, but Bogart did not testify to his opinion of the subject property's value.

## F. The Verdict

The trial court instructed the jury on the meanings of "market value" and on the project-influence rule. In answer to the only question asked, the jury found that

the property's market value on the date of the taking was $11,636,238.00, that is, the amount to which Sikes testified. The trial court denied the District's motion for new trial and rendered judgment on the jury's verdict.

On appeal, the District contends that the trial court reversibly erred in admitting as comparable-sales evidence Sikes's and Baer's testimony and exhibits concerning the Frantz contract, the Kinder Morgan contract, the School sale, and the sales of the sites of the Candlewood Suites and La Quinta hotels. In its appellate brief, the District addresses Sikes's testimony and evidence, but states that its arguments about Sikes apply equally to Baer. Our discussion of the District's evidentiary complaints similarly applies to both Sikes's and Baer's testimony and to evidence introduced through either of them.

## II. WAIVER

Before reaching the merits of the District's arguments, we must address Taub's contention that the District has waived its complaints about the admission of Sikes and Baer's evidence regarding the Frantz contract, the School sale, the Candlewood Suites sale, and the La Quinta sale.

## A.    Waiver by Introducing the Same or Similar Evidence at Trial

According to Taub, the District waived its complaints about Sikes and Baer's testimony and evidence about the Frantz contract, the School sale, the Candlewood Suites sale, and the La Quinta sale because the District introduced the same comparable-sales evidence through Clinton Bogart. On appeal, a party may not complain that the opposing side's evidence was improperly admitted if the party introduced the same or similar evidence. *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 473 (Tex. 1998). But, if the opposing side refers to the contested evidence first, then the opposing side has "opened the door" to the

evidence, and the party may "defend itself by explaining, rebutting, or demonstrating the untruthfulness" of the evidence without waiving its objection. *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 4 (Tex. 1986) (op. on reh'g); *see also Fleming v. Kinney ex rel. Shelton*, 395 S.W.3d 917, 932 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("Fleming was entitled to counter Hardwick's testimony after it had been admitted over his objection . . . ; he was not required to give up at trial in order to preserve his complaint for appeal.").

Because Taub already had introduced Sikes's and Baer's comparable-sales evidence of the Frantz contract, the School sale, and the sale of the Candlewood Suites site, the District did not waive its complaints about the admission of that evidence by eliciting the same evidence from Bogart in an attempt to discredit the testimony of Taub's witnesses. The District elicited Bogart's testimony that the people involved in each of these transactions included Taub, the School's consultant Bobby Grisham, or both. The District further elicited Bogart's admission that he met with Grisham to question him about the sales, and that the meeting also was attended by Baer and by Taub's trial attorneys. The District's apparent purpose in introducing this testimony was to cast doubt on the credibility of Taub's witnesses by implying that Taub's attorneys coordinated the appraisals that were represented as being independent, or even that Taub's attorney's coached the witnesses who attended the meeting so that each witness's testimony would be consistent with the others.

On the other hand, Bogart was the only witness to use the La Quinta sale as comparable-sales evidence in valuing the 42-acre tract at issue. Having introduced Bogart's testimony at trial, the District does not, and could not, complain on appeal that his testimony was erroneously admitted. *See Halim v. Ramchandani*, 203 S.W.3d 482, 492–93 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("Although

7

Halim obtained a pre-trial ruling and a running objection at the beginning of trial, he waived his objection to Weber's testimony that the endotracheal tube was the cause or the most likely cause of Halim's injury by being the only party to introduce this evidence."). Although Sikes and Baer also testified about the La Quinta sale, they did not use it as comparable-sales evidence in valuing the subject property. They instead stated that the La Quinta sale was used by Grisham in determining the price at which the school district would buy the 56-acre tract in the School sale. Grisham testified to this as well, and the District does not complain of his testimony on appeal.

We therefore conclude that by introducing Bogart's testimony, the District did not waive its complaints about the use of the Frantz contract, the School sale, or the Candlewood Suites sale as comparable-sales evidence, but did waive its similar complaint about the use of the La Quinta sale.

## B.    Waiver Through Admission by Adoption

Taub additionally contends that the District waived its complaint that the School sale is dissimilar to the subject property, because at the special commissioners' hearing, the District's valuation expert Tom Edmonds also used that transaction as a comparable sale. Relying on *Reid Road Municipal Utility District No. 2 v. Speedy Stop Food Stores, Ltd*., 337 S.W.3d 846, 857–58 (Tex. 2011), Taub argues that "[the District's] sponsoring of Edmonds'[s] appraisal constitutes an adoptive admission of Edmonds'[s] opinion that the [School] Sale . . . was an acceptable comparable sale." Neither that case nor the Rule of Evidence on which it relies is applicable here.

At the special commissioners' hearing in *Speedy Stop*, the municipal utility district introduced appraiser David Ambrose's testimony and written appraisal,

8

opining that Speedy Stop's damages were $9,342.00. *Id.* at 848. Speedy Stop objected to the award, and in the civil action de novo, it did not designate a damages expert. *Id.* The municipal utility district moved for summary judgment, arguing there was no evidence of damages. Speedy Stop attached to its summary-judgment response Ambrose's report and a transcript of his testimony before the special commissioners, arguing that these were admissions by the municipal utility district. *Id.* at 848–49. The municipal utility district objected to the report and transcript on the grounds that "(1) testimony at an administrative hearing is not admissible as proof of facts in the de novo trial proceeding; (2) Ambrose was not designated as an expert; and (3) Ambrose's testimony was hearsay and not an admission by the District because he was not an agent of the District." *Id.* at 849. The trial court sustained the objections and granted the summary judgment, and the intermediate appellate court did not reach the complaint about the evidentiary ruling. *See id*.

Relying on Texas Rule of Evidence 801(e)(2)(B), the Texas Supreme Court reversed the trial court's ruling. Under this rule, an opposing party's statement is not hearsay if the statement (i) "is offered against an opposing party," and (ii) "is one the party manifested that it adopted or believed to be true." *See* TEX. R. EVID. 801(e)(2)(B). The court explained that "[w]here a party has used a document made by a third party in such way as amounts to an approval of its contents, such statement may be received against him as an admission by adoption." *Speedy Stop*, 337 S.W.3d at 856 (quoting *Tex. Reciprocal Ins. Ass'n v. Stadler*, 140 Tex. 96, 104, 166 S.W.2d 121, 125 (1942)).

*Speedy Stop* and Rule 801(e)(2)(B) provide that a statement adopted by a party is not excludable as hearsay, but instead can be used against that party. As applied here, the District adopted Edmonds's statements from the special

9

commissioners' hearing, so if Taub had offered evidence of Edmonds's statements during the proceedings in the court below and the District had raised a hearsay objection, then the trial court would not have abused its discretion in overruling the objection.

But that did not happen here. To the contrary, the District asked a witness about Edmonds, and Taub objected "to any evidence regarding Tom Edmonds." No one complains on appeal that the trial court erred in overruling a hearsay objection to the introduction of Edmonds's testimony from the special commissioners' hearing; the District's complaint is that the trial court erred in overruling a non-hearsay objection to the testimony of Taub's experts Sikes and Baer. Neither *Speedy Stop* nor Rule 801(e)(2)(B), however, provides that a party who has adopted its own witness's statement waives its non-hearsay objections to similar statements by the opposing party's witness.[5] We accordingly conclude that the District has not waived its complaint that the trial court abused its discretion in admitting Sikes's and Baer's comparable-sales evidence concerning the School sale over the District's objection that such evidence is inadmissible in a takings case.

---

[5] Taub seems to imply that Edmonds's testimony before the special commissioners constitutes a binding judicial admission or that the District is judicially estopped from denying that the School sale is a comparable sale. Neither argument is correct. Edmonds's testimony is not a judicial admission and the District is free to contradict his opinion. *See, e.g.*, *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694–95 (Tex. 1980) (explaining that a "true judicial admission . . . is a formal waiver of proof usually found in pleadings or the stipulations of the parties"); *Tex-Wis Co. v. Johnson*, 534 S.W.2d 895, 903 (Tex. 1976) ("As a general rule, the testimonial declarations of a party will not be given the force and effect of a judicial admission."); *Graves v. Tomlinson*, 329 S.W.3d 128, 138 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("An appeal in the same case is not a 'subsequent action' to which judicial estoppel applies."); *cf. Gevinson v. Manhattan Constr. Co. of Okla.*, 449 S.W.2d 458, 466 (Tex. 1969) ("In analogy to the rule that a party may prove the truth of particular facts in direct contradiction of the testimony of his witness, he may also disprove factual recitals in a document introduced by him.").

### III. ADMISSION OF COMPARABLE-SALES EVIDENCE

We now reach the merits of the District's complaints that the trial court erroneously admitted Sikes's and Baer's comparable-sales testimony and evidence regarding the Frantz contract, the Kinder Morgan contract, the School sale, and the Candlewood Suites sale. We review the trial court's admission of evidence for abuse of discretion. *See Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). A trial court abuses its discretion by acting arbitrarily, unreasonably, or without regard to guiding legal principles." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

### B. Unconsummated Sales or Option Contracts

The District first argues that the trial court erred in admitting evidence of the Frantz and Kinder Morgan contracts because those transactions were unconsummated. According to the District, evidence of unconsummated sales are inadmissible in a condemnation proceeding. Taub responds by pointing to testimony that both sales would have been completed if not for the condemnation.

Both sides have misinterpreted the governing rule. The admissibility of evidence of a comparable real estate transaction does not depend on whether the sale was consummated. *See Carlton Energy Group, LLC v. Phillips*, 369 S.W.3d 433, 450 n.6 (Tex. App.—Houston [1st Dist.] 2012), *aff'd in part, rev'd in part*, 475 S.W.3d 625 (Tex. 2015). Instead, the rule in condemnation cases is that unaccepted offers to buy or sell are not competent evidence of a property's value. *See State v. Clevenger*, 384 S.W.2d 207, 209 (Tex. Civ. App.—Houston 1964, writ ref'd n.r.e.). Evidence that a sales contract was not performed goes to its weight rather than its admissibility. *See Robards v. State*, 285 S.W.2d 247, 248-49 (Tex. Civ. App.—Austin 1955, writ ref'd n.r.e.).

11

To determine whether an offer was accepted, we do not rely on the parties' testimony about whether they would have completed the transaction absent the condemnation; we determine whether there was a binding contract of sale. *See Clevenger*, 384 S.W.2d at 209–10. An option contract does not meet this test because an option does not become a binding sales contract until the option is exercised. *See id.* at 210 (explaining that an option is "a mere right of election acquired by one under a contract to accept or reject a present offer within the time therein fixed"); *see also Faucette v. Chantos*, 322 S.W.3d 901, 908 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("An option contract has two components: (1) an underlying contract that is not binding until accepted and (2) a covenant to hold open to the optionee the opportunity to accept.").

The District contends that the comparable-sales evidence of the Frantz and Kinder Morgan contracts was inadmissible because those transactions were unconsummated sales and were mere option contracts. Taub maintains that both agreements were binding contracts of sale. We conclude that the each side is partially correct: the Frantz contract was a binding sales contract and was admissible, and the Kinder Morgan contract was an unexercised option contract and was not admissible.

### 1. *The Frantz Contract*

The trial court did not abuse its discretion in admitting the Frantz contract as comparable-sales evidence of the subject property's value because Frantz and Taub had a binding contract of sale. In contrast to an option contract which requires a buyer to exercise the option to make the sales contract binding, the Frantz contract was binding, and it required the buyer to provide timely written notice of termination to make the contract non-binding.

12

The District argues that the contract was an option contract because it contained a liquidated-damages clause: if Frantz did not terminate the contract, but did not complete the purchase, then Frantz would merely forfeit the earnest money he had paid, and Taub could not compel Frantz to buy the property. But, a liquidated-damages provision does not transform a sales contract into an option contract. *See Clevenger*, 384 S.W.2d at 209 ("It was an enforceable contract in that the seller could be compelled to deed the property and the buyer could be compelled to forfeit the $5,000.00 as liquidated damages if he refused to put up the balance of the cash purchase money and consummate the sale").

### 2.    *The Kinder Morgan Contract*

The Kinder Morgan contract is inadmissible as valuation evidence because it is an option contract. It recites that Taub paid a non-refundable "Option Fee" of $53,280.00 for the right to purchase the tract for $532,800.00 within one year, and that Taub could extend the option for an additional year by paying an additional $53,280.00. Because the option was never exercised, this contract remained an unaccepted offer. *See Faucette*, 322 S.W.3d at 907–08.

Taub likens the Kinder Morgan contract to a binding contract of sale with a liquidated-damages clause because if Taub bought the land, then the money he paid would be paid toward the sale price, and if he did not buy the land, then Kinder Morgan would keep the money that Taub had paid for the option. But, the contract is not a binding contract sale, because the amount that Taub paid for the option was to be credited against the sale only if he exercised the option. He did not. Taub was not damaged by the loss of the money he paid for the option, because he received exactly what he paid for: the offer to sell the property for a stated price was held open, and Taub had the right to accept the offer within that

13

time. Because he did not do so, so the contract never became a binding contract of sale, but remained an unaccepted offer.

Evidence of unaccepted offers of sale are inadmissible as comparable-sales evidence in condemnation proceedings. *See Hanks v. Gulf, Colo. & Santa Fe Ry. Co.*, 159 Tex. 311, 315, 320 S.W.2d 333, 336 (1959). We therefore conclude that the trial court abused its discretion in admitting as comparable-sales evidence Sikes's and Baer's testimony and documents concerning the Kinder Morgan contract.

## C. Sale to an Entity with Condemning Authority

The District contends that the School sale was inadmissible because the school had condemning authority. As a matter of long-established state law, evidence of the price for which comparable property was sold to an entity with the power of eminent domain is not competent evidence of the value of the condemned property. *See, e.g.*, *City of Austin v. Capitol Livestock Auction Co*., 453 S.W.2d 461, 465 (Tex. 1970); *Gomez Leon v. State*, 426 S.W.2d 562, 565 (Tex. 1968); *State v. Frost*, 456 S.W.2d 245, 257 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.).

Taub argues that the School sale falls within an exception to this rule for sales that are voluntary and not made under threat of condemnation. Taub cites the Fifth Circuit case of *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 18–19 (5th Cir. 1969), for this exception. This exception has not been adopted by the Texas Supreme Court or by this court and we decline to do so now.

Texas courts exclude evidence of a sale to an entity with the power of eminent domain even when testimony is offered that the sale was voluntary. *See City of Abilene v. Blackburn*, 447 S.W.2d 474, 477 (Tex. Civ. App.—Eastland

14

1969, writ ref'd n.r.e.) (trial court erred in admitting, over objection, witness's testimony that a representative of the City asked the property owner "what he wanted for the property" and that when the property owner named a price, "the City drew up the papers and paid him in cash and did not argue with him about the price"); *Hodges v. State*, 437 S.W.2d 447, 448 (Tex. Civ. App.—Texarkana 1969, writ ref'd n.r.e.) (trial court properly excluded testimony that four sales to a cemetery association with the power of eminent domain were "the result of free and open sales transactions between a willing buyer and a willing seller of land in the immediate locality" of the condemned property); *Menchaca v. San Antonio Indep. Sch. Dist.*, 297 S.W.2d 363, 365 (Tex. Civ. App.—Waco 1956, writ dism'd) (trial court did not err in excluding evidence of a comparable sale to a school district, despite the proffered testimony that the sale was voluntary).

In arguing that such an exception has been accepted by Texas courts, Taub relies on *State v. Vick*, 376 S.W.2d 89, 90 (Tex. Civ. App.—Houston 1964, no writ) and *Marsh v. State*, 276 S.W.2d 852, 854 (Tex. Civ. App.—San Antonio 1955, no writ). But neither case supports the exception..

In *State v. Vick*, the jury found that the condemned property's market value was more than twice the amount of the highest value supported by the evidence. *See Vick*, 376 S.W.2d at 89–90. After suggesting remittitur, the reviewing court addressed the appellant's argument that the trial court erred in admitting evidence of the property owner's sale of another tract of land to the same state agency because the sale was made under threat of condemnation. *Id.* at 90. The *Vick* court stated,

> In view of the condition of the record, we are unable to say that the admission of such evidence was error. In view however, of the likelihood of another trial, it is pointed out that our courts have uniformly held that prices paid for property by a condemning

15

> authority are not admissible to establish market value of the property being condemned because such sales are not free and voluntary.

*Id.* The court was correct both in its statement of the rule and in its view of the likelihood of a second trial: because the appellee rejected the reviewing court's suggestion of remittitur, the case was reversed and remanded for retrial. *Id.* at 90 (supp. op.).

The court that authored *Marsh v. State* also did not adopt an exception for voluntary sales. In that case, the appellants objected at trial that evidence of a sale to the same state agency for right-of-way purposes was "irrelevant, immaterial and highly prejudicial." *Marsh*, 276 S.W.2d at 853. The reviewing court held that "[t]he evidence was not irrelevant and immaterial and it was no more prejudicial than is any other testimony that is unfavorable to a party." *Id.* at 854. The court explained that "[o]rdinarily, in passing on the correctness of a trial court's ruling in admitting evidence, the appellate court will consider the ruling in the light of the objection made in the trial court, and the complaining party will not be heard to present reasons for excluding the evidence other than those made in the trial court." *Id.* The court noted, however, that the appellants argued for the first time on appeal that the evidence was inadmissible because it concerned a compromise sale made under the threat of condemnation proceedings. *See id.* The court stated, "*If* we consider this reason, . . . we *would* still find that the trial court did not commit reversible error in admitting the testimony, because the record shows that the sale was not made to avoid condemnation proceedings nor the threat thereof, but was made freely and voluntarily." (emphasis added).

The statement about what the court "would" do "if" it considered the complaint is an advisory statement and not, as Taub contends, an alternative holding. *See Tex. Natural Resource Conservation Comm'n v. White*, 46 S.W.3d

16

864, 868 (Tex. 2001) (explaining that alternative holdings exist where the court makes multiple holdings and the court could have relied on any of them to reach the same conclusion). In any event, a decision by the Fourth Court of Appeals is not binding on this court. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (per curiam) (stating that "Texas courts . . . are *obligated* to follow only higher Texas courts and the United States Supreme Court").

Taub additionally argues that the rule for excluding evidence of sales to entities with condemning authority does not apply here because the school district only needed 16–20 acres for the elementary school it planned to build, and therefore could not have condemned the entire 56-acre tract. No case has created such an exception.

The rule looks at whether the entity has the power of eminent domain, not whether the entity could have condemned the entire tract it purchased. *See, e.g.*, *Capitol Livestock Auction Co.*, 453 S.W.2d at 465 (evidence about the amount the telephone company paid for a site "was improperly admitted since the telephone company is a corporation which has the power of eminent domain"); *Gomez Leon*, 426 S.W.2d at 565 ("Our courts have consistently held that proof of sales of property to a corporation or a governmental agency having power of eminent domain is not admissible in a condemnation suit."); *Frost*, 456 S.W.2d at 257 (same). Stated differently, the rule focuses on the status of the buyer and the seller, not of the size of the sale. *Cf. Menchaca*, 297 S.W.2d at 365 ("[S]uch sales are not free and voluntary under our rule as to what constitutes a willing seller and a willing buyer." (cited with approval in *Frost*, 456 S.W.2d at 257)). The facts of this case illustrate why this is so. Shortly before the taking in this case, the District approached the school district about buying part of the 56 acres that the school district had acquired in the School sale, but the school district rejected the offer

because it had not decided where the school would be placed. In other words, the school district had decided that the 20-acre building site would be somewhere within this 56-acre tract, but had not decided where, within the tract, the building site would be located. Because the school district could have been chosen to build a school anywhere on the tract, and could have condemned the land necessary to do so, there was no part of the tract that was free of the implied threat of condemnation.

Second, just because the school district would not have needed to condemn more than twenty acres for a school does not mean it could not have condemned the land for other purposes. For example, the superintendent of the school district was asked at trial, "What was the purpose for the school district buying that additional acreage?" He responded, "At the time there was discussion about possibly moving our current Department of Transportation to that facility." The school district can condemn property for this purpose just as it can condemn property on which to build a school. *See, e.g.*, TEX. EDUC. CODE ANN. § 11.155(a) (West 2012) ("An independent school district may, by the exercise of the right of eminent domain, acquire the fee simple title to real property on which to construct school buildings or for any other public use necessary for the district."); *Circle X Land & Cattle Co. v. Mumford Indep. Sch. Dist.*, 325 S.W.3d 859, 866 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (sub. op. on reh'g) (holding that the evidence established that a school district condemned thirty acres for a public purpose where there was an immediate need for sports facilities, but the district also intended to build a new school in the future, and "[e]ither purpose would be legitimate"). Although the school district did not pursue that option and nothing was planned for the excess acreage at the time of trial, this does not mean that the implied threat of condemnation did not exist at the time of the sale.

18

We decline to adopt either of the exceptions argued by Taub and therefore conclude that the trial court abused its discretion in admitting comparable-sales evidence of the School sale.

**D.      The Candlewood Suites Sale**

In making the fact-intensive determination whether a sale concerns a property sufficiently similar to the condemned property to be comparable and thus admissible, the trial court has considerable discretion; the degree of comparability goes to the weight of the evidence. *See Galveston Cent. Appraisal Dist. v. Valero Ref.-Tex. L.P.*, 463 S.W.3d 177, 189 & n.12 (Tex. App.—Houston [14th Dist.] 2015, pet. pending). As a result, "[c]omparable sales are generally admissible unless it appears that reasonable minds cannot differ from the conclusion that the evidence of the other sales lack probative force because of their dissimilarity to the condemned property." *Williams v. State*, 406 S.W.3d 273, 285 (Tex. App.—San Antonio 2013, pet. denied). In most cases, once an appraiser provides foundational evidence showing that the sales were of comparable property, he or she can make adjustments in the price of comparable sales up or down and explain how those adjustments account for differences in the property. *See Hou. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 835, 837 (Tex. 2014); *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). The District has not explained why such an adjustment is not possible here.

The subject property consists of approximately 42 wooded acres not currently served by an existing street. At the time of the taking, the property was unimproved but was served by water and sewer lines and bounded on one side by railroad lines. The District emphasizes the following differences between this tract and the Candlewood Suites site.

19

### 1. Improvements

The District argues in its brief as if the hotel existed when the property was sold, asserting that "[t]he two hotel property sales involved roughly two-acre tracts with hotels on them. In contrast, the subject property is a 42-acre vacant tract."[6] If this were correct, then the evidence plainly would be inadmissible. *See City of Austin v. Cannizzo*, 153 Tex. 324, 335, 267 S.W.2d 808, 816 (1954) ("The property is unimproved. Prices paid for improved lots and the value assigned to improved lots in recent sales is not admissible because not meeting the test of similarity.").

The record, however, indicates that the hotel was built after the sale. Sikes testified that the sale occurred in January 2008; that the site "was purchased for a hotel"; and that the hotel had "been there three-plus years" at the time of the 2014 trial, that is, since at least 2011. Sikes further agreed that he "used a sales comparison approach as to raw land." Even in its motion to exclude the evidence of this transaction, the District referred to the Candlewood Suites sale as "a sale that would house a *future* hotel complex."[7] The record therefore does not support the District's argument that assumes that the sale of this property included the sale of an existing hotel.

### 2. Size

The hotel property is less than 1/19th the size of the condemned property,[8] but courts have found properties to be comparable despite far larger size differences. For example, in *Joyce v. Dallas County*, the reviewing court held that the trial court did not abuse its discretion in admitting evidence of a sale of an

---

[6] The other sale to which the District refers is the sale of the site of the La Quinta hotel. As previously explained, however, the District has waived its complaint about the La Quinta sale.

[7] Emphasis added.

[8] Sikes identifies the size of the Candlewood Suites lot as 2.231 acres.

85.5-acre tract as evidence of the value of a 2.63-acre tract. *See Joyce v. Dallas County*, 141 S.W.2d 745, 745, 746 (Tex. Civ. App.—Beaumont 1940, no writ). The Texas Supreme Court has cited *Joyce* with approval for the proposition that "[e]vidence of recent sales of other property . . . meeting the test of similarity, should be admitted." *Cannizzo*, 153 Tex. at 335, 267 S.W.2d at 815.[9]

### 3.    Zoning

The Candlewood Suites site is zoned for highway services, whereas the condemned property is zoned partly for "industrial park" uses and partly for "general industrial" use.[10]  Quoting *Collin County v. Hixon Family Partnership, Ltd.*, 365 S.W.3d 860, 871 (Tex. App.—Dallas 2012, pet. denied), the District argues that the difference in zoning makes the sale of the Candlewood Suites site impermissibly dissimilar because "comparable sales must have the same highest and best use as the condemned properties on the date of taking or within a reasonable time."

The language on which the District relies is not the court's statement of the test of comparability; it is part of the authoring court's description of an expert witness's testimony. *See id.*  In determining whether a property is comparable, we look to whether the subject property "can be put to *relatively* the same uses as

---

[9] There are limits. *See, e.g.*, *Barshop v. City of Houston*, 442 S.W.2d 682, 683, 686 (Tex. 1969) (holding, in a case involving the condemnation of a 52.66-acre tract, that the trial court erred in admitting comparable-sales evidence of a one-acre tract, because "there was a disparity in the size of the two properties under comparison").  But, because appellate courts review evidentiary rulings for abuse of discretion, the trial court's determination of where to draw that line is more likely to be affirmed than reversed. *See, e.g.*, *Morgan v. State*, 343 S.W.2d 738, 740 (Tex. Civ. App.—El Paso 1961, writ ref'd n.r.e.) (holding that the trial court did not abuse its discretion in excluding comparable-sales evidence of tracts of less than one acre where the subject property to be valued was 6.79 acres).

[10] There is some testimony that the Candlewood Suites site was not originally zoned for this use, and that the City either rezoned the property or granted a variance.  It is not clear whether the City rezoned the property or granted the variance before or after the sale.

those for which the comparable properties were used, or are capable of being used." *Urban Renewal Agency of City of Austin v. Georgetown Sav. & Loan Ass'n*, 509 S.W.2d 419, 421–22 (Tex. Civ. App.—Austin 1974, writ ref'd n.r.e.) (emphasis added). Sikes testified that the highest and best use for the subject property would be an office park, which is consistent with the property's current zoning. According to Sikes, both a hotel and an office building are "commercial" uses, which he defined as "a use that generates income that's really non-industrial." While these may be "relatively the same uses," Sikes and Baer nevertheless testified that the Candlewood Suites site was superior, and both valued the subject property at a lower price per square foot ($6.00 to $6.25) than the sales price per square foot of the Candlewood Suites site ($7.42).

### 4. Access

The hotel property is located at a signalized intersection where two major thoroughfares meet. Sikes testified that "there's no physical access" to the condemned property at issue, and he agreed that a new developer would have to spend approximately $1.6 million "to get to the subject property." But again, both Sikes and Baer opined that the Candlewood Suites site's location was superior to the subject property, and both valued the subject property at a lower price per square foot than the Candlewood Suites site.

While there are significant differences between the subject property and the Candlewood Suites site, the trial court reasonably could conclude on this record that the differences are not great enough to render evidence of the Candlewood Suites sale inadmissible. In the cases in which the reviewing court found that the trial court abused its discretion in admitting evidence of a comparable sale, the dissimilarities are more extreme than those presented here. *See, e.g.*, *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 808 (Tex. 2002) (appraiser selected

22

comparable sales for their similarity to a hypothetical lot rather than to the property condemned); *Sharboneau*, 48 S.W.3d at 185 (appraiser compared condemned undivided land to sales of "ready-to-build lots in successfully completed subdivisions"); *State v. Chavers*, 454 S.W.2d 395, 396–97 (Tex. 1970) (appraiser compared sale of land containing a house to the condemned, unimproved land); *State v. Taylor*, 721 S.W.2d 541, 549, 550–51 (Tex. App.—Tyler 1986, writ ref'd n.r.e.) (comparable sales included three properties on major highways and were adaptable to commercial and business uses; condemned property was located on a graveled county road and its highest and best use was for rural homesites); *Urban Renewal Agency*, 509 S.W.2d at 421–22 (comparables were on paved and guttered streets south or west of the State Capitol; condemned property was a creekbed in a less developed area northeast of the Capitol); *State v. Cherry*, 517 S.W.2d 337, 343 (Tex. Civ. App.—Dallas 1974, writ ref'd n.r.e.) (unlike the condemned property, the comparable was not located in a floodplain and had prominent street frontage); *Joyce*, 462 S.W.2d at 87–88 (comparable sales included corner tracts at the intersection of paved streets in developed areas zoned for commercial or apartment purposes; condemned land was a vacant unimproved lot traversed by a railroad and a creek, not served by an existing street, and zoned for single family residences).

On the whole—including the recency of the Candlewood Suites site's sale[11] and its location a quarter mile from the condemned property—we cannot say that the trial court abused its discretion in failing to exclude this comparable-sales evidence.

---

[11] The Candlewood Suites site was sold on January 7, 2008; the date of the taking was July 28, 2010.

## E.    The Project-Influence Rule

In a reply argument directed only to the First Amendment to the Frantz contract, the District contends that even if admission of the original Frantz contract ($3.00 per square foot) was proper, the trial court's admission of the amendment to the contract ($6.00 per square foot for the subject portion of the property) violated the project-influence rule.

Because an impending condemnation can inflate or deflate property values, the project-influence rule has evolved to eliminate the project's effect when determining the amount that a willing buyer would pay, and a willing seller would accept, for the subject property under market conditions. *See Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142–43 (Tex. 2015). The project-influence rule applies as of the date "that the condemnor manifests a definite purpose to take the particular land," and "[t]he manifestation or announcement must be done or made publicly." *City of Fort Worth v. Corbin*, 504 S.W.2d 828, 831 (Tex. 1974). The determination of this date "must be made by the court and not by the jury." *Id.*

Even if the trial court has determined the date when the condemnor publicly manifested a definite purpose to take the subject property, it does not follow that evidence of the property's value after that date is necessarily excluded. *See Caffe Ribs*, 487 S.W.3d at 143 ("[A]n evidentiary exclusion is not an essential component of the project-influence rule."). Instead, "the preferable course [is] to admit evidence, under proper instruction, to permit the jury to eliminate the distorting effect of the project." *Id.* *But cf. Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 630 (Tex. 2002) (holding that trial court abused its discretion in admitting expert testimony for which the expert "relied on [the] condemnation in establishing a separate economic unit and in assigning a value to that unit").

24

Here, the trial court did not determine the date when the project-influence rule was triggered, and instead instructed the jury on the project-influence rule without identifying the date on which it applied. On appeal, the District does not complain of charge error, and affirmatively states that "the instruction given correctly states the law." Nevertheless, the District asserts that the project-influence rule was triggered either (1) when the District allegedly approved the detention-pond project on November 6, 2007,[12] or (2) when Frantz spoke with the District on December 11, 2007 about its intention to acquire the property. The District maintains that the Frantz contract's amendment on and after December 17, 2007 therefore reflects the distorting effect of the project's influence.[13]

Based on this premise, the District complained in its reply brief that Sikes's "[r]eliance on the first amendment to the [Frantz] contract should have been barred from consideration" by the project-influence rule. In a post-submission letter brief, however, the District stated that its "complaint is that the expert opinion and jury verdict were based on evidence barred by the [jury] instruction given," which is as follows:

> In determining the value of the Owner's 42.741 acres property as of July 28, 2010, you shall not consider any influence on the market value of the Owner's property that resulted from Harris County Flood Control District's detention project for which the property was taken.

---

[12] The document that the District cites as support for this date is an Interlocal Agreement between the District and the City of Deer Park, dated July 8, 2008; however, the document was excluded from evidence at trial, and on appeal, the District does not challenge that evidentiary ruling.

[13] The District also disputes Taub's argument that other evidence supports the increase in the contract price from $3 to $6, arguing the record does not show that Taub's representations about securing access from the property to East Boulevard were the reason for the increase. Given our disposition of the District's argument regarding the project-influence rule, we do not reach this issue.

25

You shall determine its market value as of July 28, 2010, as if there was no Harris County Flood Control District's detention project or any likelihood of such detention project.

Whether the District's project-influence-rule complaint is that the evidence should have been excluded from the jury's consideration (presumably by an evidentiary ruling) or that the evidence actually was excluded from the jury's consideration by the instruction given, the flaw in the District's argument is the same: the date on which the project-influence rule was triggered was a matter for the trial court to determine, but the District does not complain on appeal of the trial court's failure to decide that question.[14] Having waived any challenge to the trial court's refusal to determine the date on which the project-influence rule was triggered, the District cannot be heard to complain about the consequences that should have followed from a trial court decision that was never made.

## IV. HARM ANALYSIS

We have concluded that the trial court abused its discretion in overruling the District's objections to the admission of comparable-sales evidence of the Kinder Morgan option contract and of the School sale; however, the erroneous admission of evidence is reversible only if it "probably caused the rendition of an improper judgment." *See* TEX. R. APP. P. 44.1(a)(1); *Brookshire Bros., Ltd.*, 438 S.W.3d at 29. To determine whether the erroneously admitted evidence probably had such an effect, "[w]e review the entire record, and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 883 (Tex. 2014) (quoting *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004)).

---

[14] Although the District objected at trial to the trial court's refusal to submit an instruction that would have informed the jury that the District "manifested a definite purpose to take the particular land on November 6, 2007," it has not challenged that refusal on appeal, and it did not ask for an instruction that the project-influence rule was triggered on December 17, 2007.

The District initially argued that it was harmed because evidence of five of the ten comparable sales on which Taub's expert Sikes relied were inadmissible and provided an unreliable foundation for Sikes's opinion that the property's fair market value was $6.25 per square foot as of the date of the taking. In its reply brief, the District conceded that one of the five sales to which it had objected was admissible, so that it then complained that Sikes's opinion was unreliable because four of the ten comparable sales on which he relied were inadmissible. In a post-submission brief, the District argues that even if the evidence concerning the Kinder Morgan contract and the Candlewood Suites sale were the only comparable-sales evidence erroneously admitted, the District would have been harmed because none of the remaining eight properties had a value-per-square-foot as high as that impliedly found by the jury.

The District has not identified how it was harmed given that, as we have found, the trial court abused its discretion in admitting comparable-sales evidence only of the Kinder Morgan contract (at $6.44 per square foot) and the School sale (at $4.50 per square foot), but did not abuse its discretion in admitting comparable-sales evidence concerning the amendment to the Frantz contract (at $6.00 per square foot for the subject property) or the Candlewood Suites sale (at $7.42 per square foot). Indeed, Sikes testified that the Frantz contract's sales price of $6.00 per square foot for the same property is itself sufficient to support the value of $6.25 per square foot, because the additional $0.25 per square foot is accounted for by the slight rise in the market between the date of the Frantz contract and the date of the taking.

We cannot say that the trial court's error in admitting evidence of the Kinder Morgan contract and the School sale probably caused the rendition of an improper verdict because the evidence of the remaining comparable sales supports Sikes's

testimony and the jury's verdict. *See, e.g.*, *Tex. Pipe Line Co. v. Hunt*, 149 Tex. 33, 441, 228 S.W.2d 151, 156 (1950) (explaining that an expert opinion on the market value of real property "does not cease to have probative force when impropriety attaches only to some, rather than all, of its underlying reasons"); *compare State v. Schaefer*, 530 S.W.2d 813, 817 (Tex. 1975) (erroneous admission of evidence was harmful where it "put before the jury the only possible basis for the award that was made") *with State v. Chana*, 464 S.W.3d 769, 785–87 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (assuming that evidence of five of the ten comparable sales relied upon were inadmissible, but holding that the error was harmless because the five remaining comparable sales, ranging from $7.70 per square foot to $19.50 per square foot, supported the jury's finding in accordance with the expert's opinion of $9.50 per square foot).

## V. CONCLUSION

Of the District's complaints about several transactions used as comparable-sales evidence, we conclude that the complaints about two transactions are meritorious. Because the remaining evidence supports the verdict, the errors in admitting comparable-sales evidence of an option contract and of a sale to a school district with the power to condemn property were harmless. We therefore affirm the trial court's judgment.


/s/     Tracy Christopher
        Justice


Panel consists of Justices Christopher, McCally, and Busby.

28